Leon L. PARKER individually and for the use and benefit of the Estate of Mrs. Evelyn Parker, deceased, Plaintiff-Appellee,

v.

Wayne PRINCE, Bobby Cartwright Trucking Company, Defendants-Appellants,

and

International Harvester Corporation, Defendant-Appellee.

Court of Appeals of Tennessee, Middle Section.

May 24, 1983.

Application for Permission to Appeal Denied by Supreme Court Aug. 22, 1983.

Daniel L. Wischhof, Daniel D. Finch, Finch & McBroom, Nashville, for plaintiff-appellee.

W.A. Moody, Moody & Moody, Nashville, for defendants-appellants.

Thomas A. Higgins, Noel F. Stahl, Cornelius, Collins, Higgins & White, Nashville, for defendant-appellee.

## OPINION

LEWIS, Judge.

This is an appeal by defendants-appellants Wayne Prince and Bobby Cartwright Trucking Company [1] from a directed verdict in favor of defendant-appellee International Harvester Corporation (IHC) and from the judgment on the jury's verdict for plaintiff-appellee Leon Parker (Parker) in the sum of $50,000 and for the wrongful death of Parker's wife, Evelyn Parker, in the sum of $150,000 against defendants-appellants.

The pertinent facts are as follows:

On July 7, 1979, Prince was operating a 1978 International Harvester tractor, pulling an empty dump trailer, both of which belonged to his employer Cartwright. Prince was traveling westbound on Interstate 40 in Wilson County. He had made a delivery in Lebanon, Tennessee, and was headed to Nashville to pick up a load of sand.

Parker and his wife, Evelyn Parker, were traveling eastbound on Interstate 40 toward Lebanon. It had been raining all morning and at the time the accident occurred, approximately 8:30 A.M., there was a hard and steady rain.

Prince, who had stopped for coffee at a truck stop on Highway 109, re-entered I-40 West at the Highway 109 interchange and as he re-entered I-40 West, he came up behind a car that "was dragging along there on the road." Prince pulled into the left lane to pass the "draggy" car and had no problem steering the truck from the right to the left lane. He further testified that as he was passing the car his truck began to veer or drift slightly to the right. He then turned the steering wheel to the left and the truck responded by straightening up. Prince then felt the truck veer to the left and as he turned the steering wheel to the right to straighten up, the steering wheel felt loose and the truck would not respond. He testified he realized he was in trouble and immediately hit his brakes. When he hit his brakes, the truck went off the roadway and across the grass median separating the east and westbound lanes of I-40. As the truck went across the median, it struck a ditch throwing Prince off the seat and into the floorboard.

The truck then collided with the Parker automobile in the eastbound lane of I-40, injuring Parker and instantly killing Mrs. Parker. Parker then brought this suit for his injuries and the wrongful death of his wife against appellants and alleged that their negligence caused his injuries and the death of his wife. Parker's theory of liability against IHC was that of strict liability.

IHC answered Parker's complaint denying that it was in any way liable and filed a cross-claim seeking contribution or indemnity from appellants and alleging that Parker's damages and injuries were caused solely by the negligence of appellants.

Appellants answered Parker's complaint denying they were guilty of any negligence and filed a cross-claim seeking contribution or indemnity from IHC, alleging that IHC was strictly liable for Parker's damages pursuant to 2 *Restatement, Second, Torts,* § 402A (1965).

1. Defendants-appellants will hereafter be referred to either as appellants or individually as Prince or Cartwright.

Appellants' first issue is: "Whether or not the Court erred in directing a verdict at the conclusion of all the proof for the defendant and cross-defendant, International Harvester."

A motion for directed verdict requires the trial judge and the reviewing court, on appeal, to look to all the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, to allow all reasonable inferences from it in his favor, and to discard all countervailing evidence; then, if there is any material determinative evidence or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. *Country Maid Dairy, Inc. v. Hunter,* 57 Tenn.App. 138, 149, 416 S.W.2d 367, 372 (1967). Our review of appellants' first issue is pursuant to this rule.

The only theory under which Parker or appellants contend that IHC is liable is strict liability pursuant to Section 402A:

SPECIAL LIABILITY OF SELLER OF PRODUCT FOR PHYSICAL HARM TO USER OR CONSUMER

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

At trial, Parker insisted that a steering gear on the International Harvester tractor was defective and caused the accident. Appellants contended that a defectively manufactured ball joint connecting two integral steering components suddenly failed causing the accident.

There is no question that International Harvester is in the business of selling International Harvester tractors and that IHC expected the tractor involved in this lawsuit to reach the user without substantial change. However, under the theory of strict liability in Section 402A, there is the further burden "to establish that the product, when it left the hands of the manufacturer or other supplier, was at that time in both a defective and an unreasonably dangerous condition." *Ford Motor Co. v. Lonon,* 217 Tenn. 400, 420, 398 S.W.2d 240, 249 (1966).

We first discuss the alleged defective power steering gear.

Eddie Porter, a self-employed automobile and truck mechanic, has owned and operated Eddie's Garage in Nashville for some twenty-five years. Prior to owning his own garage, Mr. Porter worked as a heavy equipment and truck mechanic. At his garage, some "large trucks" are maintained but it is not their "specialty." Mr. Porter became involved in this case in February, 1982, when he was requested by Mr. Moody, appellants' attorney, "to look into the situation to see what you could come up with." Mr. Porter went to Shelbyville, picked up the power steering gear which was at that time disassembled and was just "a bunch of stuff in a box." Mr. Porter testified that he inspected the steering gear for defects and found two teflon rings that did not protrude far enough above the surface of a hydraulic control valve and also found a cracked worm shaft in the gear.

Mr. Porter did not testify that the steering gear was in a defective and unreasonably dangerous condition when it left the hands of IHC. In fact, he was not asked either on direct or cross-examination concerning this point.

On cross-examination by Mr. Higgins, IHC's attorney, Mr. Porter admitted that he did not know when the worm shaft became cracked or when the two teflon rings failed to protrude enough. He did not know and

could not say whether the defects he testified to occurred before, during, or after the July 7, 1979 accident. His testimony in this regard was as follows:

Q. Now Mr. Porter, you see two cracks in there down near the ports of one end of that worm gear, don't you?

A. Uh-huh.

Q. The hose?

A. Uh-huh.

Q. Did you see one or two cracks?

A. I see one today. Best of my memory, there was two. May be the light or whatever. I could see one real prominently there today.

Q. Now, you have absolutely no idea when those cracks occurred; do you?

A. No.

Q. There isn't a single way upon your solemn oath that you can tell this jury that those cracks were in that worm gear before the accident on July 7, 1979; out on I–40; can you?

A. No.

Q. And there's not a single way you can say on your solemn oath to this jury whether those cracks occurred or happened or were caused during the accident; can you?

A. No.

Q. And you can't say on your solemn oath to this jury whether there was something happened to this worm gear after the accident and that's when they occurred; can you?

A. No.

Q. You simply don't know?

A. That's correct.

Q. And the same thing is true with regard to what you expressed an opinion about those O rings, you don't know if, if fact, they are protruding or failed—is it that they failed to protrude or expand or are they too protruded and expanded; which is it?

A. They don't protrude.

Q. They don't protrude enough. Now, if that is actually correct, you don't know that that was the condition before the accident of July 7, 1979; do you?

A. No.

Q. And you don't know that it was the condition on the day of July 7, 1979; do you?

Q. Or you don't know and you can't say on your oath whether it's something that's happened to this since July 7, 1979; can you?

A. No.

The testimony of all other witnesses concerning the steering gear was favorable to IHC. Mr. Leslie Marvin Tomlinson testified that the steering gear was removed and disassembled after he had rebuilt the wrecked tractor but he could not remember what, if anything, was wrong with the steering gear. Mr. Hepler and Mr. Eviston, witnesses called by IHC, testified that in their opinion the steering gear was damaged during the accident.

There is no proof in this record to establish that the steering gear, when it left the hands of IHC, was defective and in an unreasonably dangerous condition.

■ The testimony concerning the allegedly defective "ball-joint assembly" also failed to show that it was in a defective and unreasonably dangerous condition when it left the hands of the manufacturer. Mr. Isaschar Golan was offered as an expert witness on behalf of appellants. Mr. Golan testified he inspected the International Harvester truck at Mr. Cartwright's place of business in Shelbyville, Tennessee, on July 16, 1979. The "ball-joint assembly," at Mr. Golan's request, was removed from the truck and sent to Mr. Golan's office in Atlanta where it was examined by Mr. Golan.

On direct examination, Mr. Golan testified regarding the ball-joint assembly: "I conducted as thorough investigation as I could and came up with the conclusion that this failure occurred as a result of manufacturing defect."

He further testified, on direct examination regarding the separation of the ball-joint connection, as follows:

Q. Well, what I'm saying is, there's nothing broken on the part in your left hand—

A. Oh, no.

Q. Something has pulled them apart?

A. Correct.

Q. All right. You just know it shouldn't be that way?

A. What I know, my indications are that they were not pulled apart as result of impact, another—against another object. This I can tell for sure.

Q. All right. Do you say they were not knocked apart?

A. I don't think like—I don't think they were separated as a result of the truck hitting another car or truck or another item on the road.

On cross-examination, Mr. Golan testified in pertinent part, as follows:

Q. All right, sir. Just without the benefit of Mr. Moody's new part down in his Toyota trunk, how is this thing when it's manufactured? How is it put together? How do they get that ball inside that cavity, as you call it? What's the mechanical process for the manufacturing of that thing?

A. I'm not an expert on ball joints.

Q. As a matter of fact, you're not an expert on the manufacture of this thing, either; are you?

A. Correct. I am not.

Q. You don't know how it's built and put together; do you—

A. Not—

Q. —the process?

A. No.

. . . .

Q. All right, sir. Now, you don't know how the ball joint is formed in the cavity; do you?

A. No. I told you, I am not familiar with the process.

Q. And you're not an expert on the manufacture of the ball joint?

A. No, sir.

Q. But you did say earlier, and you have repeated it once during my examination, that in your opinion, it's a manufacturing defect?

A. In my opinion, yes.

An opinion of an expert must be based upon facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support that conclusion. Expert opinion is inadmissible if its factual foundation is nebulous.

31 Am.Jur.2d *Expert and Opinion Evidence* § 36 at 538 (1967) (footnotes omitted).

■ When an expert witness is acquainted with the facts, as Mr. Golan claims to be in this case,

he may give his opinion upon the basis of his knowledge and observation in response to direct interrogation . . . provided he is shown to have sufficient knowledge of the facts to enable him to form an opinion entitled to be given weight by the jury, and, as a rule, provided the witness first testifies to the facts in his own knowledge upon which his opinion is based.

*Id.,* § 37 at 539 (footnotes omitted).

Mr. Golan did not give his opinion in answer to a hypothetical question. He testified in response to direct interrogation on the basis of his knowledge and observation. The Trial Judge, commenting on Mr. Golan's testimony just prior to directing a verdict for IHC, stated:

It is a motion for directed verdict for International Harvester Company. Whether or not there is any proof in this—any credible proof in this record that their product was dangerously defective when it left the hands of the manufacturer, International Harvester Company. Now, the only evidence related to that that I could find that has anything to do with that is the—as far as the plaintiff's concerned is the witness Mr. Golan. And while he described his experiment and his tests, his examination and his opinion about what this would do and that would do, I think it was on cross-ex-

amination before he said that it was a manufacturing defect. He then—as pointed out, he didn't base that on anything, that it was a manufacturing defect. He just reached up in the air and said in my opinion, it was a manufacturing defect. He didn't describe the crack in the way that would give any credibility to his opinion, and it was just a manufacturing defect. He just—anybody can say it's a manufacturing defect, but he didn't go further and tell us why nor wherefore nor what he found.

Our review of the record amply sustains the Trial Judge's findings in favor of a directed verdict. Nowhere in the record does Mr. Golan state any basis for his determination that the "ball-joint assembly" was defective when it left the hands of IHC. Further, Mr. Golan, while testifying as to his expertise on many subjects, admitted that he was "not an expert on ball joints."

As is pointed out in IHC's brief, "the specific component in question was a ball joint and the precise issue was: Did a manufacturing defect in the ball joint cause it to separate and thereby cause the accident?" To answer this question, a special knowledge of ball joints, their functions, their internal components, how they are manufactured, the ability to identify defects resulting from the manufacturing process, among other things, is required.

"To give expert testimony, one must be particularly skilled, learned, or experienced in a science, art, trade, business, profession or vocation, a thorough knowledge of which is not within the scope of the common knowledge and experience of the average person." *Kinley v. Tennessee State Mutual Insurance Company, Inc.,* 620 S.W.2d 79, 81 (Tenn.1981). Clearly, Mr. Golan, by his own admission, does not have a thorough knowledge of the very thing he sought to testify about, *i.e.,* the manufacturing of the "ball-joint assembly."

The Trial Judge correctly directed a verdict for IHC. There is no proof in the record that the International Harvester truck was defective at the time it left IHC.

Appellants' second issue is: "Whether the Court erred in its instructions to the jury and statements to the jury on directing a verdict for the defendant International Harvester by exceeding the proper and necessary instructions and by commenting on the evidence."

■ The record shows that after IHC's motion for a directed verdict had been granted the Trial Judge instructed the jury as follows:

Now, gentlemen, in your absence a motion for preemptory instructions had been made by International Harvester Company. Under the law it's necessary for the Plaintiffs to prove that this product was defective, unreasonably dangerous and defective when it left the hands of the manufacturer. And the Court was of the opinion that they had not proved it was defective and dangerous when it left the hands of the manufacturer and has granted a motion to eliminate International Harvester from this case. It's here now on the case of Leon L. Parker for and on behalf of himself for his personal injuries, medical expenses, loss of earnings and so forth and for the pecuniary value of his wife's life against Bobby Cartwright Trucking Company and Mr. Prince, the driver, agent or servant of the trucking company at the time of the accident. So the attorneys are now going to sum up and argue to you their respective theories of the case.

We find no error in the foregoing instruction. In order for IHC to be liable, it was necessary that the proof show that the product was defective and unreasonably dangerous when it left the hands of IHC. This instruction in no way reflected upon appellants' "latent defect" defense.

Appellants have cited several statements of the Trial Judge. However, these were made out of the presence of the jury and did not constitute "commenting on the evidence." We are unable to find where the Trial Judge exceeded the proper necessary instructions or commented on the evidence in instructing the jury regarding the directed verdict for IHC.

Appellants' third issue is: "Whether the Court erred in its instructions to the jury concerning the defendants' defense of latent defect by instructing the jury that this defense must be received with caution."

The Trial Judge instructed the jury regarding the defense of latent defect as follows:

> As said to you earlier, one of the defenses of the defendants in the case is that of a latent defect. In this case the Defendants Prince and Bobby Cartwright Trucking Company interposes the affirmative defense of a latent defect in the steering mechanism of the truck. The burden of proof is on the defendants, Prince and Cartwright Trucking Company, to prove to your satisfaction by a preponderance of the evidence that the truck was in good mechanical condition and because of some latent defect in the steering mechanism, unknown to the driver and owner and one which could not have been discovered in the exercise of reasonable care and reasonable inspections, and that caused the steering failures, then there could be no liability on their part to the plaintiff. That is, if the steering mechanism had previously functioned properly and suddenly and without warning failed to function, the failure does not, in the absence of knowledge of the defect or on such reasonable inspections as would have led one in the exercise of due diligence to discover it, impose liability upon the owner. As stated, the burden to show such defect is on the driver and owner of the truck. *This doctrine of latent defect should be considered by you with caution.* [Emphasis supplied.]

Appellants' defense to Parker's suit is "that they were met with a sudden emergency not of their own making and that there were certain latent mechanical defects in the tractor trailer which could not have been discovered by them and that the mechanical defect was the direct and proximate cause of the accident."

There is no suggestion in appellants' answer or in the proof in this case that Parker was contributorily negligent. There was no charge to the jury regarding contributory negligence on the part of Parker.

Therefore, under the facts of this case if the jury did not believe appellants' "latent defect" defense, they had no alternative but to find for Parker. On the other hand, if they believed that a "latent defect" existed which was unknown to appellants and which could not have been discovered in the exercise of reasonable care and reasonable inspections and that that "latent defect" was the direct and proximate cause of the accident, then appellants would not be liable to Parker.

We have searched and have been unable to find any jurisdiction that has held that a "latent defect" defense should be considered by the jury "with caution." A defense based on "latent defect" is a perfectly valid defense and is entitled to be considered by the jury in the same light as any other defense. It is not to be received by the jury with caution.

Parker argues that since the courts of this State have held that it is proper to instruct the jury to receive expert testimony with caution, *Fisher v. Travelers Insurance Co.*, 124 Tenn. 450, 504, 138 S.W. 316, 328 (1911), that no error results in charging the jury that a defense based on expert testimony should likewise be received with caution. We disagree. Expert opinion testimony is received with caution, among other reasons, because the expert has been employed and is being paid by one side or the other to testify in most instances. However, if in the instant case the jury believed the expert testimony that there was a latent defect, then appellants were entitled to have their "latent defect" defense considered, not with caution but as a good and valid defense.

Parker also argues that even if the Trial Judge's charge was erroneous, the error must be presumed to be harmless unless there is a showing that the error complained of actually affected the outcome of the trial. If the jury followed the Trial Judge's instructions concerning the law, as they are bound to do, then they gave appel-

lants' only defense less weight than that to which it was entitled. Appellants are entitled to have their "latent defect" defense considered by the jury without a limiting instruction from the Trial Judge.

We hold that the Trial Judge erred in charging the jury that the defense of latent defect should be considered with caution and that the error involved a substantial right which, more probably than not, affected the judgment. Tenn.R.App.P. 36(b).

Appellants' third issue is sustained.

█ Appellants' fourth issue is as follows: "Whether the Court erred in overruling a motion for a mistrial based on the misconduct of the attorney for International Harvester by discussing the case during the course of trial with members of the jury and misconduct of the jury by discussing the case with International Harvester's attorney."

There is not one scintilla of evidence in this case that Mr. Higgins, attorney for IHC, discussed the case during the course of trial with members of the jury or that any member of the jury discussed the case with Mr. Higgins. This specious issue is based on the following: During the course of argument on IHC's motion for a directed verdict, Mr. Moody "threatened" the Trial Judge that he would appeal if the motion were granted. Notwithstanding the threat, the Trial Judge did as he was bound, considered all of the evidence and, after that consideration, determined that IHC's motion for a directed verdict was good. After the Trial Judge directed the verdict, Mr. Higgins, his co-counsel Mr. Stahl, and Mr. Eviston, employee of IHC, gathered up their books, papers, etc., left the counsel table, went outside the bar of the court and sat near the center of the courtroom. Mr. Moody argues, in essence, that they did not have a right to stay in the courtroom and should have left after the directed verdict. This Court disagrees. Counsel had a perfect right and, since Mr. Moody had let everyone know he would appeal, counsel probably had a duty to his client to remain in the courtroom and observe the remainder of the trial.

The evidence further is that when the jury was leaving the courtroom for the day, several members, instead of turning directly to their right in exiting the courtroom as they came out of the jury box, came across the courtroom to where Mr. Higgins was talking with Mr. Alfred McFarland, a distinguished member of the Wilson County bar. Mr. Higgins had his back to the jury and, when the first juror spoke to him, he turned around. Nothing transpired between Mr. Higgins and members of the jury except that several members shook his hand and one or more of them told him that he had tried a good lawsuit. Our review of this record confirms what the jurors stated. Mr. Higgins made no comment to any of these jurors, except possibly to say thank you.

The Trial Judge held a hearing and the foregoing was all of the evidence of misconduct on the part of counsel or the jury. Even a perfunctory reading of this evidence shows there was no misconduct on either the part of Mr. Higgins or the jury. To raise an issue in this Court charging misconduct on the part of the jury or an attorney on the basis of the record before us is to treat the appellate process with little respect.

Mr. Moody, appellants' counsel, is admonished that in the future when raising issues he should have some facts on which to base those issues. This specious issue is without merit.

█ Appellants' fifth issue is: "Whether or not the Court erred in its charge on the measure of damages involved in a death action."

Appellants' complete argument in support of this issue is "that the Court erred in the charge of the measure of the damages for the death action, omitting the necessity of a deduction for decedent's probable living expenses, had decedent lived, as set forth in *Wallace v. Couch,* 642 S.W.2d 141." This alleged error was not brought to the attention of the Trial Judge at trial. "[I]n order to predicate error upon an alleged omission in instructions given to the jury, a

party must have pointed out such an omission to the trial judge at trial by a request for appropriate instructions. *Rule v. Empire Gas Corp.*, 563 S.W.2d 551, 554. *See also Valentine v. ConChemCo, Inc.*, 588 S.W.2d 871 (Tenn.App.1979)." *Taliaferro v. Green*, 622 S.W.2d 829, 832 (Tenn.App.1981). This issue is without merit.

Appellants' sixth issue is: "Whether or not the verdict for Leon L. Parker is excessive." However, appellants failed to support this issue in their brief, either by discussion or by reference to the record.

Rule 6 of the Court of Appeals provides, in part, as follows:

> (a) Written argument in regard to each issue on appeal shall contain:
>
> (1) A statement of the alleged erroneous action of the trial court which raises the issue, with citation to that part of the record where the alleged erroneous action is recorded.

■ It is incumbent upon the party raising an issue to show prejudice from the erroneous action of the trial court. This Court is not required to search the record when appellants give no reason as to why the action was erroneous. *Hill v. Hill*, 9 Tenn.App. 507 (1929). Appellants have totally failed to show how they were prejudiced. This issue is without merit.

■ Appellants' seventh and last issue is: "Whether the Court erred in admitting into evidence inflammatory pictures of the deceased plaintiff."

This issue is without merit for the reason set forth under issue six. However, we have viewed each of the photographs in this record and, after our review, agree with the Trial Judge that there is nothing in these photographs which are "inflammatory" or "prejudicial" in such a way as to outweigh any probative value.

"[T]he admissibility of photographs lies within the discretion of the trial court whose ruling in this respect will not be overturned upon appeal except upon a clear showing of an abuse of discretion." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978).

Our review of each of these photographs fails to show that the Court abused its discretion in allowing them into evidence. This issue is without merit.

The judgment of the Trial Court in directing a verdict for IHC is affirmed. The judgment in favor of plaintiff Leon L. Parker individually and for the use and benefit of the estate of Mrs. Evelyn Parker, deceased, against defendants Wayne Prince and Bobby Cartwright Trucking Company is reversed for the reasons set out under issue three and remanded to the Circuit Court for a new trial. The costs of this appeal are taxed to plaintiff.

TODD, P.J. (M.S.) and CANTRELL, J., concur.