IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 28, 2016 Session

# JOHN P. BRANHAM v. THE METROPOLITAN GOVERNMENT OF NASHVILLE - DAVIDSON COUNTY, TENNESSEE, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 12C259     Don R. Ash, Judge**

_____

**No. M2015-00455-COA-R3-CV – Filed August 30, 2016**
_____

Landowner filed an action against the Metropolitan Government of Nashville-Davidson County ("Metro") on theories of inverse condemnation, detrimental reliance, and negligence to recover for damages to his home which occurred as a result of landslides on his property. Following trial, the court entered judgment in Metro's favor on all claims. On appeal, landowner contends that the evidence preponderates against the court's findings of fact as to the cause of the landslides and the finding that Metro's expert witness was credible; that the court erred as a matter of law in holding that Metro's actions were not purposeful or intentional for the purposes of an inverse condemnation claim; and that the court erred in not crediting his testimony in the valuation of his property. Metro asks this court to reverse the trial court's determination that it owns the portion of land adjacent to landowner's property in fee simple. We reverse the determination that Metro owns the land adjacent to the landowner's property; in all other respects we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part and Reversed in Part**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Darrell G. Townsend, Nashville, Tennessee, for the appellant, John P. Branham.

Andrew D. McClanahan, Christopher M. Lackey, and Patrick J. Bradley, Nashville, Tennessee, for the appellee, the Metropolitan Government of Nashville and Davidson County.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

John Branham ("Branham") is the owner of a home located on a hillside in the Tyne Crest Subdivision on Tyne Boulevard in Nashville, Tennessee. On January 19, 2012, Mr. Branham filed suit against the Metropolitan Government of Nashville and Davidson County ("Metro") and the Electric Power Board of Metro ("NES") to recover for the destabilization of his property and resulting landslides, on theories of inverse condemnation, detrimental reliance, and negligence.[1] The complaint averred, *inter alia*, that Metro owned a right of way easement on Tyne Boulevard; that in January 2011 the surface soil on a portion of Mr. Branham's property and within Metro's right of way slid down the hill into a ditch that is maintained by Metro and within its right of way easement; that Branham received assurances from Metro officials that they would "take care" of the situation; that later in May 2011, a semi-circular crack developed up-hill from the initial slide; and that Metro did nothing to remedy the situation.

On August 14, 2012 Mr. Brahman amended the complaint to allege that Metro workers removed soil, debris, and vegetation from its right of way easement on February 6 and 7, 2012, and that less than 20 hours after those repairs, a subsequent landslide occurred causing damage to Mr. Branham's property. Metro responded to the complaint, as amended, on September 26, denying all claims and raising a number of general and affirmative defenses.

A bench trial was held over the course of four days in November 2014. On January 30, 2015, the court entered an order granting judgment to Metro on all of Mr. Branham's claims and holding that Metro owned the property adjacent to Tyne Boulevard. Mr. Branham articulates the following issues on appeal with respect to the inverse condemnation and negligence claims:

1. Whether the trial court made erroneous findings of fact with respect to the impact of Metro's actions, the nature of the slide, and the credibility of experts.
2. Whether the trial court erred, as a matter of law, in ruling that Metro's act in removing the lateral support for Branham's land was not purposeful or intentional for the purposes of inverse condemnation.

---

[1] On June 1, 2013, Mr. Branham gave notice of the dismissal of his claims against NES.

3. Whether the trial court erred in failing to credit the testimony of the homeowner in the valuation of his property as provided for by Tennessee law.
4. Whether, as a result of the errors of the trial court, Branham is entitled to have the judgment of the trial court reversed.

Metro appeals the finding that it owns the property adjacent to Tyne Boulevard and contends that it only has a right-of-way easement.

## II. DISCUSSION

Mr. Branham contends that the trial court's findings are unsupported by the record with respect to "the impact of Metro's actions, the nature of the slide, and the credibility of Metro's expert"; specifically, that the evidence supports a finding that the 2012 slide was a large scale event; that the theory advanced by Metro's expert witness and adopted by the court was unsupported by the record. He also argues that the court erroneously held that Metro was not "liable for the taking of [his] property or the damage caused by its negligence"; and that the court erred in holding that Metro's removal of dirt and debris was not a purposeful and intentional act for purposes of inverse condemnation.

## A. The 2012 Slide

The timeline of events pertinent to this appeal are uncontested:

- In May 2010, Nashville experienced an historic rainfall event and resulting flood.
- January of 2011, Mr. Branham noticed a small slide in the right of way below his property line.
- June 2011, Mr. Branham observed a small crack on the hillside adjacent to his driveway.
- On February 6 and 7 of 2012, a crew of workers from the Public Works Department of the Metropolitan Government of Nashville and Davidson County ("Metro") performed excavation work and removed vegetation in a ditch adjacent to Tyne Boulevard at the bottom of the hillside where Mr. Branham's home is located.
- On February 8 2012, Mr. Branham observed a slide at the site of the excavation work.

3

- In March 2012, Mr. Branham added rock to his property in order to stabilize the crack by his driveway.
- On May 10, 2013, the hillside experienced a landslide which spilled onto Tyne Boulevard.

The court made the following findings relative to the slide which occurred in February 2012:

James Samuel Vance, a geotechnical engineer hired by the Defendant, reviewed the property in February of 2012. His examination included taking core samples of the Plaintiffs property. Mr. Vance testified to material facts as follows:

1. Mr. Branham's driveway construction was not a contributing factor to the slide adjacent to the driveway.

2. The rainfall in May 2010 is the main cause of the unstable soil and subsequent issues regarding the Defendant's property, the Tyne Boulevard property, and the adjoining property.

3. The area in question, namely the extensive area of soil instability, is approximately 2500 square feet and continues to be unstable. The area includes the property of Defendant, Plaintiff, and Plaintiff's neighbor.

4. The efforts by Defendant in resurfacing the ditch in February 2012, and the work by Plaintiff to stabilize the crack next to his driveway may have sped up some of the soil displacement but are not the main factors in the soil displacement.

5. The cost to repair the area in question – Plaintiff's property, Defendant's property, and the adjacent land owner's property – is approximately $100,000.00.

The Court further finds James Vance, expert for Defendant, to be more credible than the Plaintiffs expert.

In ruling on the negligence claim, the court held:

This Court finds the property of Plaintiff was in its natural state, and Defendant's clearing of the soil and vegetation plus the failure to replace by

4

some artificial means the natural support removed by Defendant's excavation certainly led to a minor slide on the Defendant's property. Even though this Court finds the Defendant did not act reasonably in regard to the removal of vegetation in February 2012, the Plaintiff failed to carry its burden in establishing the amount of damages, even though possibly minimal, caused by Metro's actions. The damages presented by the Plaintiff are based on a substantial soil displacement on the property of Plaintiff, the Defendant, and an adjacent landowner which occurred due to the May 2011[2] flooding in Davidson County.

We review a trial court's findings of fact *de novo*, accompanied by a presumption of correctness of the factual findings, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). This presumption of correctness requires an appellate court "to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001) (citing *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise)). In order to preponderate against the trial court's findings of fact, the evidence "must support another finding of fact with greater convincing effect. *Rawlings*, 78 S.W.3d 291 at 296. "We also give great weight to a trial court's factual findings that rest on determinations of credibility." *Id*. (citing *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000)).

Mr. Branham acknowledges that the Tenn. R. App. P. 13(d) standard applies. He argues that the evidence preponderates against the court's finding that the February 2012 slide was a "minor slide"; rather, he contends that it supports a finding that the slide was a "large scale event" which led to subsequent slides. In support of his contention, Mr. Branham cites his testimony that on February 6 and 7 a "crew from Metro, six or eight people with heavy equipment, showed up in front of my house, . . . removed the dirt out of the ditch, removed the toe of the slope as it sat there, stripped all the vegetation off of the section of the ditch"; that the following morning at 7:00, he noticed that the hillside had slid into the ditch adjacent to the pavement of Tyne Boulevard; that the February landslide was a bigger sliding event than the landslide in May 2013; and that "substantial amounts of [his] property actually [fell] down the hill" during the seven weeks following Metro's ditch work. Mr. Branham

---

[2] It is apparent that the court meant May 2010.

also cites to the testimony of Samuel Vance, Metro's expert witness, who testified that the hillside was in total failure,[3] and to photographs of the February 2012 slide.

While Mr. Branham takes issue with the court's characterization of the February 2012 slide as "minor," the evidence does not support another finding with greater convincing effect. Mr. Branham testified that, in January of 2011, over a year prior to Metro performing the work, he noticed a landslide into the ditch adjacent to Tyne Boulevard, and that in June of that year he noticed "the start of a new slide." Mr. Vance testified that the destabilization of the hillside was caused by the May 2010 rainfall and that, at the time Mr. Branham saw the slide in 2011, the entire slope was in failure.[4] The evidence shows that the slope was

---

[3] Mr. Vance testified as follows:

> Q. Sitting here today, with the benefit of hindsight, you know that when you got out there on Valentine's Day 2012, the situation was dramatically different from what it had been in January 2011, when Branham placed his call; right?
> A. To my knowledge, yes. That portion of the slope was in total failure.
> Q. Well, yes, sir. Plainly, there was a lot more than just a small slide down at the ditch bank, wasn't there?
> A. Right.
> Q. All right. The total of the entire hillside was in failure?
> A. That's correct.

[4] With respect to the condition of the area in January of 2011, Mr. Vance testified:

> Q. Okay. And if Mr. Branham reported seeing slide materials in that steep part of the slope in January of 2011, under your theory, what is he seeing?
> A. It's my contention that, based on what we're seeing now with the limits of the slide and the scarp that we've already talked about and defined, is that this surface has moved down as this mass has rotated out. Suddenly, it has no ability to stand on air, and this part would be in tension, so this is the part that would fall out and clog the ditch in this fashion. And as it continues to move incrementally as this scarp gets taller, you have more and more mass-wasting.
> THE COURT: So it's just going to keep on falling off?
> THE WITNESS: That's right.
> * * *
> THE COURT: Didn't Metro change the slope when they came in and removed all the vegetation after this rotation starts going on?
> THE WITNESS: Change the slope itself? If they removed vegetation, that has little to do with the hundreds of tons of slide mass that began, to start with, in my opinion.
> THE COURT: So you're saying even if Metro had never done anything, they'd never cleaned out the ditch, put the burlap lining there, it still falls because it's going to keep rotating around?
> THE WITNESS: That's correct. It's compromised at that point.

compromised prior to February 2012 as a result of the 2010 rainfall and that the slide would have occurred regardless of Metro's clearing of the ditch. Taken in the context of the destabilization of the entire area over a three year period of time, the characterization of the 2012 event as a "minor slide" is supported by evidence.

## B. Expert Testimony

Mr. Branham argues that Mr. Vance's theory as to the cause of the slope failure, discussed above, was unsupported by the facts, and therefore, the finding that Mr. Vance was more credible than Mr. Branham's expert, Scott Miller, is not entitled to deference.

The facts, which Mr. Branham claims are uncontroverted, and which undermine Mr. Vance's opinion, are (1) that the landslide was not caused by the 2010 rainfall and (2) that the destabilization of the hillside was not one massive slide, but rather a series of successive slides. In support if this contention, Mr. Branham points to testimony by Scott Miller, in which Mr. Miller challenges Mr. Vance's theory and opines that the landslides which occurred on the hillside were not a part of one continuous event but rather were a series of successive slides and that Metro's inaction following Mr. Branham's first call to Metro in January 2011 contributed to the later slides; testimony by Mr. Vance that he investigated other slope failures in the area which occurred days after the 2010 rainfall and that to his knowledge, other than Mr. Branham, any slope failures attributable to the May 2010 rainfall were reported within days of the rainfall; the testimony of Mr. Vance that he believed Mr. Branham's testimony that the January 2011 slide was "fresh"; the testimony of Mr. Vance that the landmass on the hillside moved as a whole and that it moved "incrementally"; and testimony by Ricky Swift, Maintenance Manager for Metro Water Services, that in October 2011, he inspected the Tyne Boulevard right-of-way, and noticed "several areas of separation."

As we consider this issue, we are guided by the following instruction:

> An opinion of an expert must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support that conclusion. Expert opinion is inadmissible if its factual foundation is nebulous.

*Parker v. Prince*, 656 S.W.2d 391, 396 (Tenn. Ct. App. 1983) (citing 31 Am. Jur. 2d *Expert and Opinion Evidence* § 36 at 538 (1967) (footnotes omitted)).

The testimony cited by Mr. Branham does not contradict Mr. Vance's theory or compromise in any way his opinion; rather, it advances a different theory of the case. As

7

discussed earlier, Mr. Vance's opinion is supported by the facts. Based on the same facts, Mr. Miller reached a different opinion as to the cause of the soil instability on the hillside and subsequent landslides. The court, as the trier of fact, was free to accept or reject either theory. In this instance, the trial court found Mr. Vance's opinion to be more credible; the evidence does not preponderate against this determination.

## C. Inverse condemnation

Tennessee Courts recognize two types of takings under a theory of inverse condemnation—physical occupation takings and nuisance takings.[5] *Edwards v. Hallsdale-Powell Util. Dist. Knox Cty., Tenn.*, 115 S.W.3d 461, 465 (Tenn. 2003). With respect to Mr. Branham's inverse condemnation claim, the trial court held:

> Plaintiff failed to prove inverse condemnation in this cause. Defendant's actions in maintaining its own property and removing dirt and vegetation on February 12 and May 13[6] were not an intentional and purposeful act for the purpose of public accommodation. Rather, this Court finds the May 2010 flood set this tragedy in place. The various initial minor slides were manifestations of this bigger problem and the actions by Defendant were not intentional and purposeful in regard to the taking of the property. This matter more resembles that of *Edwards*, wherein the government entity had a backflow, which caused sewage to enter the homes of the plaintiffs. No intentional act of the defendant in Edwards caused this to occur. Similarly, no intentional act of Defendant in the present case caused the extensive soil instability to occur on Plaintiff's property, the adjoining landowner's property, or even the Defendant's property.

Both parties cite *Edwards* in support of their respective positions. Mr. Branham argues that the trial court erred, as a matter of law, in ruling that Metro's act in removing the toe of the slope during its February 2012 excavation work was not a purposeful, intentional act for the purposes of inverse condemnation. Specifically, Mr. Branham contends that in determining intent and purpose, "the question is not whether the consequences of the actions were intended or were the purpose of the act, but rather whether the act itself was intended"; and because Metro undertook the intentional act of clearing the ditch for the benefit of the public in February 2012, it acted with purpose and intent within the meaning of inverse

---

[5] Because physical occupation takings are the type of taking pertinent to this appeal, we do not discuss the legal or factual circumstances that give rise to a nuisance-type taking.

[6] It is apparent that the court meant February 2012 and May 2013.

condemnation. Metro argues that *Edwards* stands for the proposition that a governmental entity must act with intent to exercise its power of eminent domain, and that, because Metro's intent in clearing the ditch was to make the ditch operational and not to exercise its power of eminent domain, Metro did not act with purpose or intent as contemplated by an inverse condemnation claim.

A succinct explanation of the theory of inverse condemnation was set forth in *Edwards*:

"Inverse condemnation" is the popular description for a cause of action brought by a property owner to recover the value of real property that has been taken for public use by a governmental defendant even though no formal condemnation proceedings under the government's power of eminent domain have been instituted. A "taking" of real property occurs when a governmental defendant with the power of eminent domain performs an authorized action that "destroys, interrupts, or interferes with the common and necessary use of real property of another." Not every destruction or injury to property caused by governmental action, however, constitutes a taking under article I, section 21 of the Tennessee Constitution. Tennessee courts have recognized two classifications of takings: physical occupation takings and nuisance-type takings.

Physical occupation takings arise when a governmental defendant causes either a direct and continuing physical invasion of private property or a destruction of a plaintiff's property rights. . . . We have held that such direct and physical invasions constitute a governmental taking when real property is either actually appropriated or the common and necessary use of the property is rendered impossible or seriously interrupted. Physical occupation takings may also arise when a governmental defendant causes a destruction of a plaintiff's property rights. This type of physical occupation constitutes a taking when there is a diminution in the value of real property peculiarly affected and directly invaded that is not shared by the public at large.

115 S.W.3d at 464–65 (internal citations omitted).

As set forth in *Edwards*, in cases where the court has found that a "taking" has occurred, the governmental entity "performed a purposeful or intentional act for the public good that resulted in damage to a plaintiff's property or property rights." 115 S.W.3d at 466. Thus, under our reading, *Edwards* does not require that an act must be done with the purpose

9

or intent to take; rather, *Edwards* requires that the government engage in some purposeful or intentional act that results in damage to the plaintiff's property.

Applying this interpretation, we disagree with the trial court's conclusion that Metro's actions were not purposeful or intentional for purposes of inverse condemnation. Gary Johnson, head of the Metro crew that cleared the ditch in February 2012, testified that the ditch clearing was done for the purpose of cleaning and redefining the storm water ditch; this was a purposeful, intentional act.

The penultimate question for resolution, however, is whether the ditch clearing caused the damage to Mr. Branham's property; in this case, the evidence does not support such a finding. As held by the trial court, and as supported by the record, the damage to Plaintiff's property was precipitated by the May 2010 rainfall. The testimony of Mr. Vance, quoted *supra* at footnote four, is clear that the slide would have occurred naturally, irrespective of Metro's actions. While the court stated that Metro "did not act reasonably in regard to the removal of vegetation in February 2012,"[7] the proof does not support a finding that Metro's action in clearing the ditch caused the damage, constituted a continuing physical invasion, or rose to the level of destruction of Mr. Branham's property such as to constitute a "taking" for purposes of inverse condemnation.[8]

## D. Valuation of Loss

Consistent with his inverse condemnation theory of recovery, Mr. Branham introduced evidence as to the value of his property before and after the landslides; he argues that the trial court failed to credit his testimony in this regard. We will address this issue, notwithstanding our holding that Metro's actions did not constitute a taking of his property for the purpose of inverse condemnation.

---

[7] The court made this statement in ruling on Mr. Branham's negligence claim.

[8] In reversing the Court of Appeals and reinstating the trial court's grant of summary judgment to the defendant, the Supreme Court in *Edwards* held:

> The backup was most likely caused by tree roots entering the line, not by any purposeful or intentional act on the part of HPUD [Hallsdale-Powell Utility District]. If the backup was caused by the failure of HPUD to meet its obligation to operate and maintain its sewer system as alleged, its failure would constitute negligence, not a taking.

115 S.W.3d at 467.

10

The proof of value of his property consisted of the testimony of Mr. Branham and Ms. Becky Anderson, a realtor. The only other testimony pertaining to monetary damages was that of Mr. Vance and Mr. Miller, who agreed that the cost to remediate the soil stability problem would be from $80,000-$100,000.[9]

Mr. Branham testified as to the value of his property prior to February of 2012 and the value at the time of trial:

> Q. Now, Mr. Branham, do you have your own opinion concerning the value of your property immediately before Metro's actions in February of 2012?
> A. Yes, sir.
> Q. And what is your opinion of the value of your property at that time?
> A. It was appraised at 580. I thought that was a little low. I thought it was worth probably about 660, $660,000.
> Q. So is the appraised value, as set by the Metropolitan Trustee, one of the factors that you utilized in assessing the value of your own property?
> A. Yes, sir.
> Q. And can you explain how that factors in to your opinion of the pre-damage value of your property?
> A. Well it's the only thing, I guess, I had to go on, was what the appraisal that they had done, as far as anything additional to my own opinion. It was my opinion, based upon all the work I had done on the house and all the things I added to the house, that it was worth in excess of $600,000. I believe that firmly.
> * * *
> Q. Do you have an opinion now of what the value of your property at 1426 Tyne Boulevard is after the February 2102 actions of Metro and all the consequent slides that have occurred since that time?
> A. In its current condition, I think it's worth probably a third of what it was before. I think it's somewhere in the 200- to 225-thousand-dollar range.
> Q. And what is the basis for that opinion.
> A. My house is a 35-year-old stick-built, five-level, 2,500-square -foot house that's worth about $660,000 in a neighborhood where they're building two- and three-million-dollar houses. I think it's a good shot for a teardown. They're tearing down houses –
> Tyne Boulevard runs from Franklin Road to Belle Meade Boulevard.
> * * *

---

[9] This cost includes remediating the portion of the landslide area that is not on Mr. Branham's property. Mr. Branham does not make an argument relative to the cost of remediation as a measure of damages on appeal.

Q. Now, Mr. Branham, the history that you have had with the tax appraisals is one of the factors that you factor in to your analysis of the before-and-after value of your house?

A. Yes

Ms. Anderson, who has experience in the sale of homes built on hills in the area in which Mr. Branham lives, was tendered as an expert witness as to the marketability and salability of Mr. Branham's property. She testified that the stability issues at the home adversely affected its marketability and potential sales price and needed to be corrected; she was not offered as an expert on, and did not give an opinion as to, the before and after value of the house or the cost of repair.[10]

"[T]he measure of damages for injury to real estate is the difference between the reasonable market value of the premises immediately prior to and immediately after injury but if the reasonable cost of repairing the injury is less than the depreciation in value, the cost of repair is the lawful measure of damages." *Fuller v. Orkin Exterminating Co., Inc.*, 545 S.W.2d 103, 108 (Tenn. Ct. App. 1975). "[T]he owner of real property is qualified, by reason of his ownership, to give an opinion as to the value of his land." *State ex rel. Smith v. Livingston Limestone Co.*, 547 S.W.2d 942, 943 (Tenn. 1977) (citing *Nashville Interurban Ry. Co. v. Seay*, 1 Tenn. Civ. App. 134, 144; *Union Joint Stock Land Bank of Louisville v. Knox Cnty.*, 97 S.W.2d 843 (1936); 32 C.J.S. Evidence § 546 (120), at 470; 5 Nichols, Law of Eminent Domain, at 18-117)). When an owner's opinion is not supported by a rational basis, a trial court should accord no weight to an owner's valuation. *Airline Const. Inc. v. Barr*, 807 S.W.2d 247, 256 (Tenn. Ct. App. 1990). "[T]he owner's opinion will be given little weight when founded on pure speculation. There must be some evidence, apart from mere ownership, that this 'value' is a product of reasoned analysis." *Id.* (citing *Snow Bank Enterprises, Inc. v. United States,* 6 Cl. Ct. 476 (1984). Tennessee courts have consistently held that tax assessments cannot be considered as evidence in condemnation cases. *See Wray v. Knoxville, L.F. & J.R. Co.*, 82 S.W. 471 (Tenn. 1904) (reversing a jury verdict because of several errors, including the admission of a tax assessment); *West Tennessee Power and Light Co. v Hughes*, 15 Tenn. App. 37 (Tenn. Ct. App. 1932) (stating that trial court correctly excluded evidence of tax assessments); *Knoxville Community Development Corp. v. Bailey*,

---

[10]  In response to a question from the court, Ms. Anderson opined:

Q. So can you testify about marketability when the [slope stability issues] have not been fixed?

A. I think it would be very difficult to market the house. You have to disclose all of this, and it would be difficult. It would be an "as is," which, you know, "as is" means kind of a dog in real estate marketing terms. . . .

No. E2004-01659-COA-R3-CV, 2005 WL 1457750 (Tenn. Ct. App. June 21, 2005) (holding that "tax assessments cannot be considered in determining fair compensation for land taken by eminent domain.").

Mr. Branham's opinion of the value of his property began with the appraised value, to which he added the value of some improvements he had made to the home since he purchased it in 1996.[11]  In light of their inadmissibility as evidence, tax appraisals are not competent evidence upon which to base an opinion of value.[12]  In the absence of any other evidence, his opinion is speculation.  Further, Mr. Branham's opinion related to the diminution in value after several slides, rather than any diminution in value caused by Metro's February 2012 work.  Even had our holding in section C, *supra,* been different, there was no competent proof of diminution in value upon which to base an award of compensation under an inverse condemnation theory.

## E.  Metro's Property Interest

Metro argued at trial that it had no duty to maintain the area of the slide because it only had a right-of-way interest; the trial court held otherwise.  Although Metro did not file a counter claim or request any relief from the trial court, in the findings of fact the court stated:

> There is a dispute as to whether Defendant owns the property in question or if

---

[11]  Mr. Branham tendered the 2011, 2012 and 2013 property tax statements as an exhibit to his testimony, and Metro's objection to their admissibility was sustained.  Mr. Branham made an offer of proof of the statements and they are included in the record on appeal.  Mr. Branham does not assign error to the exclusion of the statements at trial.

[12]  The following discussion from *Knoxville Cmty. Dev. Corp. v. Bailey* is illustrative:

> The reason tax assessments are excluded from evidence in condemnation cases is because such assessments are conducted for a purpose that is entirely different from establishing just compensation for public acquisition of private property and because the tax appraiser uses a very different appraisal process for that purpose.
>
> > This court knows judicially and as part of the financial history of the state, that land is never assessed for purposes of taxation at its real cash value, though that may be the law, but only in comparison with other lands around it....
>
> *Wray,* 82 S.W. at 475.

2005 WL 1457750, at *4 (Tenn. Ct. App. June 21, 2005).

13

it is an easement on the Plaintiff's property. This court finds Defendant owns the property adjacent to Tyne Boulevard, next to the Plaintiff's property.

On appeal, Metro argues that, contrary to the holding of the trial court, Mr. Branham's property line extends to Tyne Boulevard, and that, in any event, no proof was presented to show that Metro has any interest in the land in question other than a right-of-way easement.

The trial court did not make specific findings of fact in holding that Metro owns the property. When the trial court fails to explain the factual basis for its decisions, we may conduct a *de novo* review of the record to determine where the preponderance of the evidence lies or remand the case with instructions to the court to make the required findings of fact and conclusions of law and enter judgment accordingly. Tenn. R. Civ. P. 52.01; *see Lovlace v. Copley*, 418 S.W.3d 1, 36 (Tenn. 2013); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). We have determined that the record is sufficient to conduct a review *de novo*; accordingly, in the interest of expeditious resolution of this matter and judicial economy, we proceed to determine where the preponderance of the evidence lies.

The evidence presented with respect to the boundary issue included: a right of way agreement for Tyne Boulevard signed by the grantors, George and Elizabeth Williams, on February 20, 1937; the plat for the Tyne Crest Subdivision, recorded September 8, 1965, signed by Howard George, as owner; the deed conveying Mr. Branham's property to him on May 3, 1996;[13] aerial photographs taken by the Metro Planning Commission between 1959-2009; a survey prepared by Campbell, McRae & Associates, Surveying, Inc. on behalf of Mr. Branham; and a survey prepared by Ragan-Smith Associates, Inc. on behalf of Metro.

The right of way agreement stated that the grantors "have bargained, covenanted and agreed, and hereby obligated ourselves to convey . . . by good and valid warranty deed to the County of Davidson . . . a strip of land over and across the lands of the aforesaid, for a public

---

[13] The deed states as follows:

Beginning at a point on the Northerly margin of Tyne Boulevard, said point being the common corner of Lot No. 7 and Lot No. 6 on the above plan; thence with the margin of Tyne Boulevard North 89 deg. 01' West 133 feet to a point in the Easterly line of Lot No. 8 on said plan; thence with the common line between Lots No. 7 and 8 Northwardly 153 feet to a monument; thence North 5 deg. 58' East 209.98 feet to a monument; thence Eastwardly with a curve to the left, said curve having a radius of 747 feet, a distance of 105.66 feet to a monument; thence South 2 deg. 08' 30" East 169.03 feet to a monument; thence with the common line between Lot. No. 7 and Lot No. 6 Southwardly 192 feet to the point of beginning.

14

road as now located by the Davidson County Highway Commission. . . ."[14] The subdivision plat as well as the surveys site Tyne Boulevard and a separate five foot "Easement for Right-of-Way for Tyne Boulevard" extending from the north margin of Tyne Boulevard for the length of the subdivision, except at lot 7, currently owned by Mr. Branham, and a portion of lot six. The photographs are consistent with the plat in that they show what appear to be the north and south boundaries of Tyne Boulevard with the area in front of lot 7 and a portion of lot six indented.

In our consideration of this issue we are guided by the rule in *Hong v. Foust*:

The following rule has been adopted in Tennessee:

The construction of deed and other instruments and documents and their legal effect as to boundaries is a question of law. What boundaries the grant or deed refers to is a question of law; where those boundaries are on the face of the earth is a question of fact. If, therefore, the evidence concerning the location of the true boundary line between adjacent landowners is conflicting, that issue is one of fact unless the legal construction of the deed or grant is such that the boundary is determined as a matter of law.

12 Am. Jur. 2d *Boundaries* § 121 (1997) (footnotes omitted). We therefore review the trial court's finding as to the true location of the [ ] boundary line as a finding of fact that is entitled to the presumption of correctness. Tenn. R. App. P. 13(d). Thus, we will not disturb the trial court's judgment unless the evidence preponderates against it. *Id.*

No. E2011-00138-COA-R3-CV, 2012 WL 388448, at *5 (Tenn. Ct. App. Feb. 8, 2012). Moreover, the general rule, as set forth by our Supreme Court, is as follows:

---

[14] The agreement states that the land is to be is to be 1,115 feet long, containing .02 acres, with the following description:

A strip of land from Station 28 + 00 to Station 32 + 25, average width 30', extending 40' on right and 20' on left of center line.
A strip of land from Station 36 + 00 to Station 42 + 90, average width 40', extending 25' on each side of center line.
The right to channel change the branch from Station 34 + 00 to Station 36 + 00, keeping the branch on the right of the center line and on private property.

15

> The rule deducible from all of the authorities is that each case must be determined upon its own facts, and with a view of giving effect to the intention of the parties. Where it appears clearly from the whole instrument, in conjunction with the surrounding circumstances, that the grantor intended to reserve the fee in the street, such intent will be given effect; when it does not so appear, it will be presumed that the grantee takes to the middle of the street.

*City of Nashville v. Lawrence*, 284 S.W. 882, 888 (Tenn. 1926).

There is no testimony, deed, or other document explaining or detailing the specific location of the property or interest conveyed to the Davidson County Highway Commission, for what would become Tyne Boulevard. The February 1937 document was titled "Right of Way Agreement for Public Roads"; it did not convey an ownership interest in the property described therein but, rather evidenced an intent to do so. Construing the instrument in accordance with the plain language of its title, only a right of way through the Williams' property was intended to be conveyed by a proper instrument. The subdivision plat, showing a five foot "easement for right of way" on the north margin of Tyne Boulevard, and the aerial photographs, are consistent with this intent. The property description in Mr. Branham's deed stating that Mr. Branham's property line runs "with the margin of Tyne Boulevard," upon which he relies, is not sufficient to establish that Metro owns the property at issue. Accordingly, the evidence preponderates against the court's determination that Metro owns the property.

A right-of-way is not an ownership interest, but rather, "a right an owner has to some lawful use of the real property of another." *Pevear v. Hunt*, 924 S.W.2d 114, 115 (Tenn. Ct. App. 1996) (citing *Brew v. Van Deman*, 53 Tenn. 433, 436 (1871)). From the record before us, we conclude Metro has only a right of way.

### III. CONCLUSION

For the foregoing reasons, we reverse the trial court's holding that Metro owns the property adjacent to Tyne Boulevard and that Metro's actions in performing the work in February of 2012 was not an intentional act; in all other respects, the judgment is affirmed.

RICHARD H. DINKINS, JUDGE

16